MEB W. ANDERSON (10227)
Assistant Utah Attorney General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
E-mail: mebanderson@agutah.gov

*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| ROBERT R. BAKER,<br><br>                         Plaintiff,<br><br>v.<br><br>SIDNEY ROBERTS, *et al*.,<br><br>                       Defendants. | **STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:15-cv-668<br><br>Judge: Clark Waddoups | |

Sidney Roberts, Kennon Tubbs, Joseph Coombs, Terry Jeffries, Logan Clark, Raymond Merrill and Sam Stone ("State Defendants"), by and through counsel, Meb W. Anderson, Assistant Utah Attorney General, hereby move for Summary Judgment on the claims asserted in Plaintiff's Amended Complaint.  (Docket No. 13.).

## <u>INTRODUCTION AND RELIEF SOUGHT</u>

Plaintiff Robert Baker (Baker) asserts claims against the State Defendants for violation of his Eighth Amendment right to be free from deliberate indifference to his medical needs.  Dr. Richard Garden was dismissed from this matter, as was a retaliation claim, in a Memorandum Decision & Order Granting in Part and Denying in Part the State Defendants' Motion to Dismiss. (Docket No. 45).  The remaining State Defendants request the remaining claims be dismissed.

In the Memorandum Decision & Order, the Court highlighted the issues remaining

relating the Baker's claims of deliberate indifference to his medical needs:

1)      Whether the claims asserted against **Dr. Tubbs**, **PA Clark**, **PA Jefferies**, and **Sam Stone** were untimely under the applicable four-year statute of limitations;

2)      Whether **Dr. Tubbs** was deliberately indifferent when "on October 4, 2005, Defendant Tubbs consulted Plaintiff regarding neuropathy and pressure sores, then told Plaintiff that he would have to buy shoes at the commissary instead of providing the special shoes recommended by a specialist."

3)      Whether **PA Clark** was deliberately indifferent when "before October 28, 2010, Defendant Clark refused to provide medical sports shoe needed by Plaintiff."

4)      Whether **PA Jeffries** was deliberately indifferent when "on October 28, 2010, Defendant Jeffries refused to provide authorization for well-fitted shoes. [and] around February 25, 2013, Defendant Jeffries withheld vital medications from Plaintiff."

5)      Whether **Sam Stone** was deliberately indifferent when "on May 5, 2010, Defenant Stone delivered ill-fitting slippers instead of well-fitted shoes."

6)      Whether **Dr. Roberts** was deliberately indifferent when "on February 19, 2013, Plaintiff consulted with Defendant Roberts about the loss of his medications and all of his clearances being revoked, but Dr. Roberts refused to renew plaintiff's medication or reinstate his medical clearances."

7)      Whether **PA Coombs** was deliberately indifferent when "in Spring of 2013, Defendant Coombs cut open a pressure sore, causing infection."

8)      Whether **PA Merrill** was deliberately indifferent when "on July 22, 2013 Defendant Merrill examined serious pressure ulcer caused by ill-fitting prison issued wide shoes and denied the use of shower shoe for ulcerated foot."

(Docket No. 45, at pages 11 and 12 of 13) (emphasis added, and marks omitted).

Baker's entire medical history about his foot issues involves thousands of pages of

medical records.  Baker has over 5500 pages of medical records documenting his care while

incarcerated.  The *Martinez* Report contains his entire medical history for 2013-2014 when his

foot issues, as alleged here, were at their most significant.  (Baker 333-1182).  Baker was

repeatedly, and still is, referred to the University Medical Center (UMC) for treatment. (Baker 001-332). Relevant medical records regarding Baker's proper foot care in 2005-2012 were included. (Baker 1313-1348). Relevant medical records showing how USP medical has continued to treat Baker were produced. (Baker 1349-1385); *see* (Baker 102-279). These records plainly evidence that Baker suffered no clearly established constitutional violation.

The *Martinez* Report and relevant case law cited herein evidences that the State Defendants treated Baker within reasonable and medically acceptable standards.[1] Given the extensive treatment and accommodations Baker received for his chronic peripheral neuropathy, no State Defendant was deliberately indifferent.

## UNDISPUTED MATERIAL FACTS

1.      Baker has been a patient at the prison since his incarceration began in 2005. He communicated to the medical staff that he had been diagnosed by an outside provider with Multiple Sclerosis (MS). (Roberts Dec. at ¶ 7.)

2.      Drs. Tubbs and Roberts were medical doctors at the Utah State Prison. (Docket No. 13, at page 4 of 136.)

3.      Joseph Coombs, Terry Jeffries, Logan Clark, and Ray Merrill were all physician assistants at the Utah State Prison. (Docket No. 13 at pages 5 and 6 of 136.)

4.      Sam Stone was the medical supply officer at the Utah State Prison. (Docket No. 13, at page 8 of 136.)

5.      Baker had his medical intake exam on or about February 23, 2005. (Baker 1345).

---

[1] The *Martinez* Report and exhibits were sent to Baker, who has filed a "motion" to compel the Declarations, which he claims he did not receive. (Docket No. 53). The State Defendants have mailed a second time the Declarations. (Docket No. 52). The motion to compel is thus moot.

6.     Because he claimed he had MS, Baker was given many medical clearances, and still has many clearances today. (Roberts Dec., Docket No. 49-14 at ¶ 14;) (Baker-UDC 1263-70, 1345-46, Docket No. 50-5); (Coombs Dec., Docket No. 49-15, at ¶ 34).

7.     USP Medical relies in part on inmates providing them with "a brief medical history[.]" (FD18 Medical Custody Interface, Docket No. 49-9, at 1393).

8.     Baker was able to purchase tennis shoes from commissary, and also received clearances for medical shoes.  Baker never had inappropriate shoes for his medical conditions. (Roberts Dec., Docket No. 49-14, at ¶ 11.)

9.     On September 29, 2005 Baker met with Dr. Tubbs and claimed that he had a history with neuropathy and that he needed quality shoes.  Dr. Tubbs referred Baker to a podiatric specialist at UMC.  Tubbs noted that Baker had a large ulcer on the dorsal aspect of his fifth toe. (Docket No. 13, at page 106 of 136); (Baker 1346-47).

10.     Baker had a long history of shoe caused pressure sores, multiple sclerosis, and pedal numbness, and was currently being prescribed:  Bacitracin ointment, Cephalexin, Ibuprofen, and Actifed.  Baker had a dressing change on his foot on September 29, 2005. (Docket No. 13, at page 91 of 136); (Tubbs Dec., Docket No. 49-10, at ¶ 11).

11.     On October 4, 2005, Dr. Terry Smith recommended that Baker continue taking Cephalexin and that he receives daily dressing changes for ten days.  He also documented in his notes "long history of multiple lesions and pedal numbness … obtain well fitted 'wider shoes' otherwise this will repeat again."  (Docket No. 13, at page 93 of 136); (Tubbs Dec., Docket No. 49-10, at ¶ 12); (Baker 092-093).  Dr. Smith also debrided two lesions and removed necrotic tissue but did not note any infection. (Baker 093, 1347).

12.     Dr. Tubbs told Baker, based on Dr. Smith's note, to buy wider New Balance shoes, which were available at the commissary. (Docket No. 49-10, at ¶ 6-7, 13).

13.     After the October 4, 2005 visit USP medical started Baker on antibiotics and dressing changes and foot care until the wound resolved.  (Baker 1347-48).

14.     Baker has never been prescribed medical shoes, but he has had clearances to receive them.  His entire prescription history at UDC was included in the *Martinez* Report. (Baker-UDC 1271-1312); (Docket No. 50-6, Prescription History).

15.     In 2005 when Dr. Smith from UMC recommended "well-fitting shoes" he did not mean medical shoes or orthotic shoes.  He meant tennis shoes that fit.  Baker needed wider shoes. (Roberts Dec., Docket No. 49-14, at ¶ 10); (Coombs Dec., Docket No. 49-15, at ¶ 35).

16.     Obtaining wider fitting New Balance shoes was a reasonable recommendation and accommodation for Baker.  (Tubbs Dec., Docket No. 49-10, at ¶ 14).

17.     After Dr. Tubbs told Baker to buy wider New Balance shoes, Baker did so and had no complaints about his shoes or his ability to obtain shoes. (Docket No. 49-10, at ¶ 8).

18.     In 2006 Baker was treated for an acute stress fracture to his right foot.  Reported he cannot feel his feet because of MS. (Baker 1337-43).

19.     On January 5, 2007 Jeffries treated Baker for a toenail infection. (Baker 1336).

20.     On February 27, 2007 Baker was seen by Cody Charlton in the prison infirmary regarding an ulcer on his left foot.  Baker had been self-treating the ulcer with USP provided antibiotic ointment and gauze pads.  Charlton ordered more ointment and bandage supplies for Baker's personal care use in his cell.  (Docket No. 13, at page 107 of 136); (Baker 1335).

21.     On May 1, 2007 Baker received clearance for outside orthotics.  (Baker 1334).

5

22.     In September 2007 Baker's right foot was imaged, no fracture. (Baker 1332-33).

23.     On July 31, 2008, Baker reported to Nurse Howard that he had tingling in his fingers.  Reports regular walking. (Baker 1331).

24.     PA Logan Clark saw Baker as a patient over 100 times between 2007 and 2012. Usually these visits were for prescription refills and medical clearances regarding Baker's allergies and claimed MS. (Baker 1190-1262); (Clark Dec., Docket No. 49-11, at ¶ 5).

25.     On January 15, 2009 Baker requested arch supports brought in from outside the prison. This was approved as long as they met security standards. (Baker 1253, 1329-30).

26.     On April 9, 2009, Baker saw PA Clark for an ulcer on his right foot. Clark noted that "Ulcer on edge of 5th digit of R foot is noted.  Im [inmate] reports that cause is his shoes which are small and not wide enough for his feet.  Im [inmate] has had ulcers previously.  Will order cipro BID x 10 days, antibiotic ointment and will f/u [follow up] im [inmate] in 3 days. Clearances placed for [wide athletic] shoes and for insoles."  (Baker 1249-1251).

27.     On April 13, 2009, Baker saw Clark to follow up on his wound, which was improving. (Baker 1249, 1326-28).

28.     In April of 2009, Baker met with Sam Stone, Medical Supply Officer, who measured his feet and delivered a pair of size 12, 4E, New Balance shoes. (Baker 1268).

29.     In April of 2009 Baker received a clearance for size 12 shoes wide for pressure ulcers.  These would have been medical clearance shoes but may not have been Pedors brand at this time.  Until now Baker had also been receiving clearances for insoles and purchasing his own sneakers at the commissary. (Coombs Dec., Docket No. 49-15, at ¶ 38); (Baker 1268).

30.     In August of 2009 Baker reports to Nurse Howard that his MS has progressed, but that he is working. Howard tells Baker to notify medical for concerns with MS. (Baker 1325).

31.     The next time Baker was seen by PA Clark regarding his foot issues was on March 8, 2010 and Baker reported his ulcers had all resolved.  He did have a nodule on one toe, that he had tried, himself to file down and it started bleeding.  There were no signs of infections, but to be certain PA Clark did order an x-ray.  (Clark Dec., Docket No. 49-11, at ¶ 17;) (Baker 1241, 1321-24); (Docket No. 13, at page 109 of 136.)

32.     On April 20, 2010 Baker saw PA Clark again. Clark reported that Baker's feet were normal, and that the nodule seen in March was resolving.  "It is healing and doing well." Foot exam shows normal R and L feet.  Clark ordered medical shoes and arch support inserts for size 12-4E shoes.  (Clark Dec., Docket No. 49-11, at ¶ 18); (Baker 1239, 1320); (Docket No. 13, at 110 of 136;); (Baker 1268).

33.     These were medical clearances that were granted, as well as the clearance for the shoes.  Clearance requests are out of Clark's hands. (Docket No. 49-11, at ¶ 19).

34.     The UDC has a clearance request committee for special medical requests and accommodations. (Clark Dec., Docket No. 49-11, at ¶ 20).

35.     The rest of 2010, Baker was seen by PA Clark on many other occasions for issues such as prescription refills and physical exams. During these visits, no pressure ulcers or nodules issues were reported. (Clark Dec., Docket No. 49-11, at ¶ 28-33;) (Baker 1225-1239).

36.     Pedors shoes are orthopedic specialty shoes that the prison orders for inmates that have a medical clearance. (Clark Dec., Docket No. 49-11, at ¶ 16).

37.     Pedors shoes may have helped Baker avoid getting pressure ulcers if he had used them as appropriate.  But he continued to walk and pace and wear out the shoes.  He also walked in his bare feet, which would exacerbate his condition. (Docket No. 49-11, at ¶ 25).

38.     Pedors shoes are cleared for inmates with neuropathy because they are made of a soft material and do not rub and create blisters. (Jeffries Dec., Docket No. 49-12, at ¶ 11).

39.     Pedors shoes were more money than athletic shoes and are specifically designed to alleviate pressure ulcers.  They are not slippers.  They have a sole, with softer uppers to prevent friction.  (Docket No. 49-13, at ¶ 16).

40.     On May 5, 2010, because they had been ordered by PA Clark, Stone delivered a pair of Pedors shoes to Baker. (Stone Dec., Docket No. 49-13, at ¶ 6-7).

41.     At this time the UDC medical clearance shoes were Pedors shoes. The medical department determines which shoes the UDC purchases for medical clearance. The UDC had a contract with Pedors that began in 2009 or 2010.  Stone had no part in the medical decision of contracting with Pedors but would purchase the Pedors when they were authorized by medical for an inmate. (Docket No. 49-13, at ¶ 7).

42.     Baker told Stone that he did not like the Pedors but accepted the shoes anyway. Baker was allowed to have these shoes through a medical clearance.  He also may have had his laundry issued shoes.  And he could still purchase New Balance athletic shoes through the commissary. (Stone Dec., Docket No. 49-13, at ¶ 8-15, 20.)

43.     Baker would have had his medical shoes, and any other standard issue shoes, or shoes he had purchased through commissary.  An inmate does not just have medical shoes and nothing else. (Jeffries Dec., Docket No. 49-12, at ¶ 14).

44.     There are at least four different ways an inmate could obtain a pair of shoes, either through laundry, the commissary, a property contract (family can send in shoes), or a medical clearance.  Having medical shoes does not prevent an inmate from utilizing any other method or having other shoes. (Stone Dec., Docket No. 49-13, at ¶ 21).

45.     Baker never received a prescription for medical shoes, but rather received Pedors shoes on medical clearance. (Coombs Dec., Docket No. 49-15, at ¶ 37).

46.     Baker has an extensive medical history of very poor circulation due to a vascular disease. This disease causes poor circulation in the body and makes it harder for the body to heal from wounds and infections. It can create a significant risk for amputation. Baker knew he could face amputation at some point if he did not respond to treatment. Baker was told that if he used the shoes as directed and reduced his walking (Baker was known to pace and pace daily), it would benefit him greatly in decreasing ulcers.  He continued to pace and walk excessively daily. Baker continued to develop non-healing wounds on both of his feet from this pacing and walking. (Clark Dec., Docket No. 49-11, at ¶ 27).

47.     Different shoes would not have changed the reality of Baker's degenerative medical condition. (Clark Dec., Docket No. 49-11, at ¶ 45).

48.     On September 2, 2010 during a visit with Nurse Howard, Baker reports neuropathy in his feet.  Baker and Howard discussed the importance of daily foot checks to recognize problems with feet which he may not feel. (Baker 1318-19).

49.     On October 28, 2010, PA Terry Jeffries evaluated Baker. Baker complained in his visit that he had a hole in one of his Pedors shoes. "The hole was about 1/16 inch in diameter and Jeffries was unable to authorize more than one pair of medically authorized shoes per year, but

he called Sam in medical supply and left a message on his phone re this matter.  The right shoe

has a hole in the toe."   The hole was more of a cosmetic issue. Baker demanded that Jeffries

replace his shoes, but Jeffries explained that he wasn't due for his once a year replacement yet.

(Jeffries Dec., Docket No. 49-12, at ¶ 7-9); (Baker 1317); (Docket No. 13, at page 111 of 136.)

50.     Seven months later, Baker again visited the infirmary regarding his foot issues.  A

new clearance for Pedors shoes was given, as well as clearance for a shower chair. (Baker 1267).

51.     On April 18, 2011 Baker was examined by PA Cody Charlton. "Reports HX of

MS with neuropathy to bilat lower ext.  Has medically issue shoes that he is wearing today but

reports he does not wear all the time and then has issues with sores to feet.  Upon exam has a 4-5

mm ulceration to dorsal aspect of 2nd digit of RT foot with no discharge and appears to be

healing.  Has been using topical ABX ointment as ordered and bandaids.  Given extra bandages.

Reports has enough topical ABX ointment.  Instructed to report to medical if ulceration does not

improve."  (Baker 1314-16); (Docket No. 13, at page 112 of 136) (emphasis added).

52.     Baker knows that prison policy requires that he "follow all prescriptions,

treatment, or other directions given by clinical staff[.]" (FD18, Docket No. 49-9, at 1395).

53.     Baker was fully aware of the serious nature of his peripheral neuropathy and that

amputation of his toes, or feet, was a distinct possibility.  He knew that he needed to take care of

his feet in his cell, and that failure to do so would exacerbate his condition.  He knew that every

time he received a dressing change (sometimes twice a day) the reason for the change was to

combat infection and problems with his chronic foot sores, that were a direct result of his

peripheral neuropathy. (Clark Dec., Docket No. 49-11, at ¶ 13).

54.     On April 25, 2012 Baker was seen by Nurse Howard, who noted he had clearances for wide shoes. (Baker 1313).

55.     From 2005 to 2013 Baker made no claims in his visits with PA Coombs that his shoes were inadequate or causing him problems. (Coombs Dec., Docket No. 49-15, at ¶ 36).

56.     On January 8, 2013 Baker received renewed medical clearance for shoes. (Baker 1267).

57.     On January 18, 2013, Jeffries saw Baker regarding prescription refills and clearances relating to his claimed MS. No issues regarding his feet or legs were brought up by Baker on this visit. (Jeffries Dec., Docket No. 49-12, at ¶ 22-24).

58.     On January 19, 2013, after consulting with Baker, Dr. Roberts noted that: "States he was diagnosed in 1994 with MS.  Has never been on any treatment.  States on outside he too[k] holistic medicine.  States he was DXD with a CT that showed 3 scars.  Notes he is in remission."  (Docket No. 13, at page 115 of 136.)

59.     Baker reported to Dr. Roberts that "his real doctor" had diagnosed him with MS and this was why he walked and paced in his cell. However, this walking and pacing were damaging Baker's feet, so in March 2013, because Baker did not have neurological symptoms, Dr. Roberts ordered an MRI to test for MS (Docket No. 49-14, at ¶ 12, 15-21); (Baker 066).

60.     Baker, who never was not in possession of his medical clearance shoes, had the clearance renewed again on March 29, 2013. (Baker 1266-67).

61.     On April 17, 2013 an MRI was conducted at UMC and although it was stopped due to Baker's claimed claustrophobia, no lesions were noted on the MRI. On June 28, 2013, a second MRI was conducted (with the assistance of valium) which also confirmed no lesions or

scarring consistent with MS and confirmed that Baker does not have MS.  (Roberts Dec., Docket No. 49-14, at ¶ 25); (Baker 075-081).

62.     On July 22, 2013 PA Merrill examined Baker regarding a pressure ulcer on his foot.  He refused dressing changes during this visit. He had a 1-centimeter blister, about the size of a dime, on his foot.  During this visit he requested medical clearance for crutches and a shower shoe to wear to "air his foot out." Merrill examined his wound, found that the top had come off, that the skin was healthy, there was no drainage erythema, odor, or other symptoms. Merrill told Baker to keep the blister clean.  Baker refused a dressing change.  He was given band aids and bacitracin but told to let it air out part of the day.  (Docket No. 49-16, at ¶ 7); (Baker 1183).

63.     After the visit on July 22, 2013, that same day, Merrill submitted a clearance request for crutches and a pair of shower shoes.  This request then moved to the medical Clearance Committee.  (Merrill Dec., Docket No. 49-16, at ¶ 8).

64.     On August 1, 2013 Baker was evaluated by Dr. Tubbs, "eval of leg today shows cellulitis and ulcer on the base of left foot.  Area was demarcated using a sharpie pen and started on ABX."  (Docket No. 13, at page 119 of 136.)

65.     On August 6, 2013 Baker and Dr. Tubbs met again.  The cellulitis in Baker's leg was markedly improved.  He was told to continue to take oral antibiotics for remainder of the course.  Baker was informed that the MRI at the UMC showed no finding of MS.  (Docket No. 13, at pages 21 and 119 of 136.)

66.     Policy allows that clearances may be removed if "it is no longer medically expedient (as determined by clinical staff only)."  (FD18, Docket No. 49-9, at 1411).

67.     Baker has had many clearances, and even when some of the clearances he had for his falsely claimed MS diagnoses were briefly removed, they were reinstated as needed because of the progressive and degenerative nature of his idiopathic peripheral neuropathy.  (Docket No. 50-5, Medical Clearance History).

68.     All clearances were eventually reinstated. (Docket No. 49-14, at ¶ 27).

69.     On September 3, 2013, Baker saw Roberts regarding a pressure ulcer.  Dr. Roberts referred Baker to the UMC wound clinic. (Roberts Dec., Docket No. 49-14, at ¶ 29); (Baker 061).

70.     Idiopathic, means no known cause.  Peripheral Neuropathy means a nerve problem that causes pain, numbness, tingling, swelling, or muscle weakness in different parts of the body. (Coombs Dec., Docket No. 49-15, at ¶ 59).

71.     There is currently no cure or treatment aimed at an underlying cause for idiopathic peripheral neuropathy. Baker's symptoms were, and still are, being managed by medication. This is being done in consultation with UMC Neurology, who ultimately decided the treatment course would be to manage the symptoms with medication and observation. (Roberts Dec., Docket No. 49-14, at ¶ 31).

72.     Through September and October 2013, Baker was seen by USP medical staff for dressing changes on an almost daily basis but was known to refuse dressing changes. No signs of infection were noted. On September 27, 2013 he was seen for a foot wound at UMC Burn Clinic. (Baker 059-060, 1072-1096).

73.     On October 22, 2013 Baker was transported to the UMC neurology clinic for a visit with Dr. Kolb and conduction of a sensory nerve study related to neuropathy that began in the early 90s.  (Docket No. 13, at pages 21 and 103 of 136); (Baker 063-65).

74.     The nerve study confirmed Baker has long standing Idiopathic Peripheral Neuropathy, which means there is no identifiable treatable cause. All tests for causes were negative.  We do not know what is causing his neuropathy. (Docket No. 49-14, at ¶ 30).

75.     On November 5, 2013, Merrill examined Baker again when Baker complained of redness on his leg. During the exam, the leg was not hot, and had no increased redness and no swelling. Baker indicated no pain with palpitation.  Baker had a long history of cellulitis and appeared to have an early cellulitis flare. Merrill ordered a follow up with Dr. Roberts and started Baker on antibiotics and Tylenol. (Merrill Dec., Docket No. 49-16, at ¶ 11); (Baker 1184-1185).

76.     On November 13, 2013, Roberts saw Baker again for complaints of swelling in his right leg. Between November 20th and 23rd Baker was seen daily for iv antibiotics and was then switched to oral antibiotics. (Baker 1043-1048).

77.     On November 14, 2013 UMC noted that Baker presented "to clinic for an initial visit regarding neuropathy.  He first started to notice symptoms in the early 90s." (Baker 052).

78.     On November 29, 2013, PA Coombs pared down a blister on Baker's foot so that it could heal quicker. When Baker would present at the infirmary for treatment, Coombs would often pare down, or debride, the calluses or blisters on his feet to attempt to keep them from getting infected and to allow the wound to heal quicker. (Docket No. 49-15, at ¶ 7, 53).

79.     On December 10, Baker saw Clark for cellulitis. He was examined and no bleeding/redness was noted around right foot ulcer. Given antibiotics again. (Baker 1194).

80.     On December 19, 2013, Merrill saw Baker for a sick call and requested that Merrill renew a number of clearances that the Clearance Committee had rejected.  Merrill indicated to Baker, and noted, that he would not revisit clearances that were rejected by the Clearance Committee.  (Merrill Dec., Docket No. 49-16, at ¶ 13); (Baker 1186-1187).

81.     On December 24, 2013, Baker and Tubbs reviewed lab work. (Baker 1020).

82.     On December 31, Baker saw Roberts for fever and leg redness. (Baker 1018-19).

83.     Throughout 2014, Baker was seen almost daily by prison medical staff to have his feet cleaned and dressings changed. (Baker 333-1006).

84.     On January 3, 2014, Baker saw Dr. Roberts for a follow up. Dr. Roberts noted that Baker seemed much improved. (Baker 1006).

85.     On February 20, 2014 Baker was seen in the USP tele-med neurology clinic by Dr. Tkach and reminded to continue good foot care, and to continue treatment with the UMC wound clinic. Baker was referred to "Fit-Well" for shoes "fitting for idiopathic neuropathy with frequent foot sores."  Dr. Tkach noted that Baker's symptoms date to the early 90's.  Baker told Dr. Tkach that "[m]ost of his needs for care (shower stool, foot wear, cane or crutches, lower bunk, etc.) have now been met."  Dr. Tkach notes that Baker has no feeling in his toes, up to his mid shin.  Ulcers were noted on both feet but did not appear to be infected.  (Docket No. 13, at pages 21, 94, 103-105, and 123 of 136;) (Baker 047, 071-74, 082-091).

86.     Dr. Tkach diagnosed Baker with "a history of slowly progressive length dependent sensory motor axonal neuropathy that appears to be idiopathic."  "He has compensated well and is taking all the precautions I can think of already."  Baker is aware, that while the prison can monitor his feet, he needs to take better care of them as related to his ulcers.

"If his pain gets worse then a small does of gabapentin or amitriptyline would be reasonable. Otherwise follow up as needed." (Docket No. 13, at page 105 of 136.)

87.     On March 7, 2014 Baker had another tele-med burn clinic consult under the direction of PA Umbrell.  It is noted that Baker was "seen at Fitwell yesterday."  (Baker 982).

88.     Telemed is a where a UMC physician or resident will appear on a monitor in the UDC infirmary.  The patient can see the doctor and the doctor can see the patient.  There is a hand-held camera to show the physician any wounds or problem areas with an up-close view. This is how UMC treated Baker via Telemed. (Clark Dec., Docket No. 49-11, at ¶ 12).

89.     On March 10, 2014 inserts were delivered to Baker. (Baker 097).

90.     On May 12, 2014, Baker saw PA Duford who checked his ulcers and noted there was no infection, but that Baker showed up wearing sandals with dirty feet. (Baker 926-927).

91.     On May 30, 2014, Coombs noted that Baker had bilateral ulcers in both feet with neuropathy and that they needed debridement as they were not healing.  Coombs noted that debridement would be done the next week, that Baker likely needed to be in a wheelchair, that he had seen the UMC Burn unit (wound clinic), and that he had seen Fitwell for orthotic inserts, but showed up wearing shower shoes and not shoes with the inserts. (Docket No. 49-15, at ¶ 8).

92.     On June 3, 2014 Coombs saw Baker again and pared down callus ulcers on both feet. Coombs noted that there was no bleeding, and that he would refer Baker to the U of U wound clinic as he needed surgical intervention.  The left foot wound was mildly infected, and Baker was on antibiotics.  Coombs noted he needed to be non-weight bearing.  The reason Coombs noted he needed surgical intervention was so that any infection did not get into the bone, which would likely require amputation.  (Docket No. 49-15, at ¶ 9); (Baker 890).

93.     On June 4, 2014 Coombs ordered an MRI for Baker at UMC to check for osteomyelitis infection of the metatarsals.  (Coombs Dec., Docket No. 49-15, at ¶ 10).

94.     On June 9, 2014 Coombs again pared down ulcers.  He noted they will need more attention and that an MRI and wound clinic referral were pending. (Docket No. 49-15, at ¶ 11).

95.     On June 13, 2014 Baker received a medical clearance for size 13 flips to be worn in the shower.  These were not "shower shoes." (Baker 1265).

96.     On June 20, 2014 Coombs again pared down the ulcer on the left foot.  He noted that that right foot looked better. (Coombs Dec., Docket No. 49-15, at ¶ 12).

97.     Between these visits Baker was seen by USP medical staff nearly every day as needed or requested for various things like dressing changes, cleaning of the wounds, etc. (Coombs Dec., Docket No. 49-15, at ¶ 13); (Baker 863-981).

98.     On June 25, 2014 Baker had an MRI on both feet.  Coombs noted the results in the medical charts.  There were no signs of osteomyelitis (infection in the bone).  (Coombs Dec., Docket No. 49-15, at ¶ 14); (Docket No. 13, at page 102 of 136;) (Baker 032).

99.     On July 7, 2014 Baker was seen in the infirmary regarding his left foot swelling. It was noted that Baker had a follow up with the UMC wound clinic in four days.  Baker's foot did not appear infectious.  Continued antibiotics.  (Docket No. 13, at page 125 of 136.) (Coombs Dec., Docket No. 49-15, at ¶ 15).

100.    On July 18, 2014 PA Coombs evaluated Baker's foot and requested follow up in two weeks.  It is noted that things are "doing better." (Coombs Dec., Docket No. 49-15, at ¶ 16); (Docket No. 13, at page 126 of 136.)

101.    On July 30 or 31, 2014 Baker is seen by the UMC tele-med burn clinic for wound evaluation. UMC noted "Patient has been closely monitor[ed] for open wound by Joe Coombs, PC-C at the prison. He reports that he was instructed to limit physical activity and [t]o reduce the amount of walking until wounds are healed, however, patient has remained active." (Baker 040); *see* (Coombs Dec., Docket No. 49-15, at ¶ 17); (Baker 028).

102.    Through July 2014 Coombs oversaw nearly daily treatment, dressing changes, sterile cleansing, ointment was applied, and antibiotics. (Docket No. 49-15, at ¶ 18).

103.    On August 6, 2014 Coombs noted: "Came to infirmary, just seen last week, left foot did not look infected then, seen by wound clinic via Telemed, ordered to see surgeon for debridement, wound vac vs. graft.  Today dorsum of foot has wound open, inmate claims pus and blood, when I saw it, no pus, but blood, explored wound, open wider with scalpel for packing, tracks toward hind foot, does not smell, will pack, will still send to surgeon, asked that secretary get this done asap, if sx not available, would consider ER referral, will draw labs, will get x-ray (done, does not appear have bone involvement), repeat MRI if time permits, start abx, Bactrim and clindamycin, wound pack qd, follow up on Friday if no visit with surgeon by then. Inmate will be on-weight bearing, will be in wheelchair, has refused that to this point, no choice now, will need to keep weight off this foot."  (Coombs Dec., Docket No. 49-15, at ¶ 19); (Baker 796); (Docket No. 13, at pages 22, 126 of 136); (Baker 094).

104.    On August 7, 2014 Baker was seen again by the U of U wound clinic via Telemed.  Labs were reviewed with the wound clinic.  Telemed determined that Baker needed aggressive intervention and he was sent to UMC by USP.  The Nurse that was with Baker during the Telemed visit noted that Baker was advised that amputation of his left first toe was a

possibility.  Wounds were re-dressed. (Coombs Dec., Docket No. 49-15, at ¶ 20); (Baker 014, 023-027, 788); (Docket No. 13, at pages 22 and 126-127 of 136.)

105.    When he arrived at UMC on August 7, 2014 it was noted that he had a "14 month history of non-healing wound on his right foot and a 12 month history of a non-healing wound on his left foot.  His problems began after taking a long walk."  (Baker 020).

106.    On August 12, 2014 still in the UMC-ICU, Baker received treatment on both feet for pressure ulcers.  UMC debrided the wounds with curved Mayo scissors and Russian Forceps. In the medical records related to that surgery, the following is noted: "Mr. Baker … has been visiting the jail infirmary every 2-4 weeks for wet to dry dressing management with no improvement."  "Three days prior to arrival, Mr. Baker developed some fever, chills, and night sweats.  The jail infirmary was concerned for emphysematous changes and transferred the patient here for evaluation."  "He has shown no signs of infection or osteomyelitis."  (Docket No. 13, at page 96 of 136); (Coombs Dec., Docket No. 49-15, at ¶ 21) (Baker 002, 044).

107.    While hospitalized, Baker developed pseudomonas infection. These types of infections are unfortunately possible in patients with idiopathic peripheral neuropathy. UMC treated Baker for this infection. (Roberts Dec., Docket No. 49-14, at ¶ 39); (Baker 005).

108.    This treatment was directed by UMC. (Docket No. 49-14, at ¶ 40).

109.    When Baker ultimately acquired the infection that caused amputation of his left toes, it is very likely he obtained the infection while hospitalized at the University of Utah. (Roberts Dec., Docket No. 49-14, at ¶ 41).

110.    The infection he acquired, pseudomonas, is not a prison related infection.  This infection is typically acquired in a hospital. (Roberts Dec., Docket No. 49-14, at ¶ 42).

111.    On August 16, 2014 Baker returned to the USP infirmary where he stayed until August 21.  Baker was treated with antibiotics and twice a day dressing change. Baker was being administered IV antibiotics four times a day, along with oral meds. (Coombs Dec., Docket No. 49-15, at ¶ 22-23); (Baker 305-314, 1193-1194); *see* (Baker 003, 009-13, 752-786).

112.    On August 20, 2014, Coombs noted that Baker had been sent to UMC on August 7, was a direct admit, had surgery debridement, now has twice daily dressing changes and antibiotics, and was being followed by UMC and Dr. Roberts.  (Docket No. 49-15, at ¶ 24).

113.    On August 21, 2014 Baker was moved to USP general housing from the infirmary.  (Docket No. 13, at page 23 of 136.)

114.    On August 27, 2014 Baker was started on antibiotics again.  On August 28 he visited with Dr. Roberts, who continued to monitor wounds.  (Docket No. 49-15, at ¶ 25); (Baker 732). PA Coombs and Umbrell, and others, monitored Baker's wounds.  (Baker 714-726).

115.    On August 28, 2014, Roberts confirmed Baker had a re-infection and there was another sore on his foot. Baker was sent to UMC. (Docket No. 49-14, at ¶ 38).

116.    On or around August 29, Telemed and Coombs scheduled follow up. (Baker 098).

117.    In a September 2, 2014 Telemed visit with UMC Coombs examined Baker's feet and noted left ulcer was doing better, back on antibiotics, right ulcer doing better.  Coombs pared down the callus.  Baker was wearing cast shoes, sitting in his wheelchair, and he instructed him to "stay off these feet so they will heal."  (Docket No. 49-15, at ¶ 26); (Baker 714).

118.    On September 10, 2014 Baker was seen via UMC Telemed, per Coombs' follow-up request.  (Coombs Dec., Docket No. 49-15, at ¶ 27); (Baker 099-101, 318-332).

20

119.    On September 16, 2014 Baker had a consult through tele-med and his antibiotic was changed to Meropenem, and his dressing changes were continued.  He had been receiving these twice daily and was being seen and evaluated by USP medical staff daily.  He had good range of motion to the affected joints and was assessed with cellulitis and peripheral neuropathy. "Wound care, activity instructions and anticipatory guidance regarding wound healing with the Patient and Prison Staff.  Verbal understanding obtained."  (Docket No. 13, at pages 23 and 97- 101 of 136.)  (Coombs Dec., Docket No. 49-15, at ¶ 28); (Baker 315-317, 647).

120.    Baker's antibiotic infusions were continued until the middle of November 2014. Dressing changes continued until December 15, 2014. (Docket No. 49-15, at ¶ 29).

121.    Through November and December 2014 Baker was being monitored closely for infection related to his wounds. (Baker 293-304).

122.    On November 14, 2014 Baker was seen by UMC Telemed, wound culture results appear resistant to antibiotics.  Switched to IV meropenum four times a day.  Completed course of merpenum on 11/9.  Reports minimal pain. Undergoing twice daily dressing changes. Reports the wound on his right foot has healed. Feels left foot is unchanged.  Currently being followed by Joe Coombs.  Possible surgical consult for the non-healing wound. (Baker 299-304).

123.    On December 15, 2014 Baker was transported to UMC.  X-rays showed bone involvement in his left foot.  Amputation of one or more toes was recommended.  Surgery was scheduled with Dr. Beals. (Coombs Dec., Docket No. 49-15, at ¶ 30); (Baker 287-292).

124.    On December 22, 2014 Baker was returned from the UMC after surgery to remove infected bones in the toes on his left foot. (Baker 280-287); (Docket No. 49-15, at ¶ 32).

125.    The decision to amputate toes was made by UMC. (Docket No. 49-14, at ¶ 43).

126.    Although not directly at issue here, Baker was properly and professionally treated by both USP and UMC after his amputation surgery. (M-Track 2015, Docket No. 50-8, Baker 1349-1385); (UMC Records at Baker 102-279).

127.    In 2015 Baker's condition of idiopathic neuropathy and poor circulation was generally deteriorating and exacerbated by Baker's poor foot care and repeated failure to follow recommendations regarding wound care and to stay off his feet. (Docket No. 49-16, at ¶ 14).

128.    To that end, Coombs noted that on August 10, 2015 Baker was seen walking around his cell without his crutches, despite the fact that a new blister was forming.  This was further evidence of Baker not following USP Medical's directions. (Baker 1188); (Merrill Dec., Docket No. 49-16, at ¶ 15-16).

129.    Idiopathic Peripheral Neuropathy is a progressive disease.  If Baker had actually been denied shoes, or had no shoes, he would have had these issues much sooner.  Baker's shoes were appropriate and did not contribute to the progression of this disease.  There is no shoe that will stop this progressive disease. (Coombs Dec., Docket No. 49-15, at ¶ 60).

130.    The medical State Defendants (i.e. not Stone) would not change the course of treatment for Baker at the prison.  He was consistently treated properly, promptly, and above the standard of care.  There is no cure for the disease from which he suffers. The treatment of symptoms and conditions as they arise is reasonable and appropriate for patients with idiopathic peripheral neuropathy coupled with poor circulation. (Roberts Dec., Docket No. 49-14, at ¶ 44); *see also* (Merrill Dec., Docket No. 49-16, at ¶ 17); (Jeffries Dec., Docket No. 49-12, at ¶ 26-27); (Coombs Dec., Docket No. 49-15, at ¶ 61-62); (Clark Dec., Docket No. 49-11, at ¶ 46-48); (Tubbs Dec., Docket No. 49-10, at ¶ 16-18).

## SUMMARY JUDGMENT STANDARD

Summary Judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[2]  A mere factual dispute will not preclude summary judgment; rather there must be a genuine issue of material fact.[3]  A Court need not blindly accept Baker's one-sided version of events.[4] Further, in opposing summary judgment Baker must provide "significant probative evidence tending to support the complaint."[5] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[6] The Court "must distinguish between evidence or disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities."[7]

A motion for summary judgment based on qualified immunity places additional burdens on the plaintiff that are not found in the typical summary judgment setting.[8] Baker bears the heavy burden of proving (1) that the facts alleged make out a violation of a constitutional right, and/or (2) that a reasonable municipal official would have known they were violating such a constitutional right.[9] "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."[10]

---

[2] Fed. R. Civ. P. 56(a).
[3] *See Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000).
[4] *See Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).
[5] *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968).
[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).
[7] *Beard v. Banks*, 548 U.S. 521, 530 (2006).
[8] *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995).
[9] *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009).
[10] *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001).

### Eight Amendment Standard - Deliberate Indifference to Medical Care

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."[11] However, "deliberate indifference" entails more than mere negligence.[12] A prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability.[13] And "While [inmates] may take issue with the treatment approach of [defendant], a prisoner's difference of opinion with prison medical personnel regarding the type of treatment he should receive does not rise to the level of a constitutional violation."[14] Thus, "Deliberate indifference" involves both an objective and a subjective component.

The objective component is met if the deprivation is "sufficiently serious."[15] A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[16] There is no dispute that Baker had a serious medical condition.

The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety."[17] The subjective component ensures that deliberate indifference is manifested only when prison officials "intentionally interfere with treatment once

---

[11] *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

[12] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[13] *See, e.g., Estelle*, 429 U.S. at 105-06.

[14] *Farmer v. Brennan*, 511 U.S. 825 at 838 (1994).

[15] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[16] *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) (further quotation omitted)).

[17] *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

prescribed."[18] In clarifying the deliberate indifference standard, the United States Supreme Court has held that a prison official cannot be found deliberately indifferent, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[19]

The subjective component also ensures that allegations of mere negligence in diagnosing or treating a medical condition, or "inadvertent failure to provide adequate medical care,"[20] are insufficient to state a claim. "To satisfy the subjective component, the defendant must possess a sufficiently culpable state of mind, rising above negligence or even gross negligence and being tantamount to intent to punish."[21] Thus, "[d]eliberate indifference is "more than negligence and approaches intentional wrongdoing."[22] Under this high standard "medical personnel are entitled to substantial deference in choosing a proper course of treatment."[23]  "This is so even if [a] misdiagnosis results in an inadequate course of treatment and considerable suffering."[24]

Here, the medical records and declarations in the *Martinez* Report plainly show that the State Defendants worked hard to ensure proper care for Baker together with UMC, and that they have extensively and properly treated Baker's foot issues throughout his incarceration.[25]

---

[18] *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (emphasis added).
[19] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added).
[20] *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir.1996).
[21] *Hix v. Tennessee Dept. of Corrections,* 196 Fed. Appx. 350, 2006 WL 2431103 at page 355 (6th Cir.) (quotes and citation omitted) (emphasis added); *see Mason v. City of Denver*, 221 F.3d 1352 (10th Cir. 2000) (deliberate indifference requires more than negligence or misdiagnosis).
[22] *Brewer v. Thompson*, 2017 WL 1592449, at *3 (D. Utah Apr. 28, 2017).
[23] *Todd v. Bigelow*, 2012 WL 627965 (D. Utah 2012).
[24] *Threatt v. Olger*, 2010 WL 1848515, at *8 (W.D. Mich. May 7, 2010) (courts are reluctant to second guess medical judgments and constitutionalize claims which sound in state tort law).
[25] *See Head v. Tubbs*, 2014 WL 949971, at *5 (D. Utah Mar. 11, 2014).

## ARGUMENT

**I.      The Statute of Limitations Precludes Many of Baker's Claims.**

The Court has identified claims precluded by Utah's four-year statute of limitations.[26]

"This action was filed on September 17, 2015; thus, any claims accruing before September 11,

2011 could be barred by the statute of limitations."[27] The allegations against Dr. Tubbs were

from 2005, and claims against PA Clark, PA Jeffries, and Sam Stone, were from 2010.[28] The

Court required Plaintiff "show cause why the statute of limitations should be tolled[.]"[29]

Baker claims that he was supposed to get "well-fitted" shoes in 2005, and that the prison

did not provide them until 2014.  Baker claims the alleged continued deliberate indifference and

his lack of medical knowledge precluded him from knowing he had a claim in 2005 or 2010.

This is Baker's only argument for tolling. (Docket No. 46).  But the Tenth Circuit has never held

that the "continuing violation" doctrine tolls the statute of limitations in § 1983 cases.[30] In fact, in

February of 2018, the Tenth Circuit, in a published decision, held that "this court has not yet

decided whether [the continuing violation doctrine] should apply to § 1983 claims[.]"[31] The

*Vasquez* case involved medical claims, and the Court would not apply the continuing violation

doctrine to the § 1983 claims.

---

[26] Utah's residual statute of limitations is four years, and the "claims accrue when the facts
supporting the cause of action 'are or should be apparent.'" *Willett v. Turley*, 2012 WL 733756,
at *4 (D. Utah Mar. 6, 2012) (citing *Fratus v. DeLand*, 49 F.3d 673 (10th Cir. 1995)).
[27] *Baker v. Garden*, 2018 WL 4621758, at *1 (D. Utah Sept. 26, 2018).
[28] *Loard v. Sorenson*, 561 F. App'x 703, 705 (10th Cir. 2014) (claims accrue on day of violation).
[29] *Baker v. Garden*, 2018 WL 4621758, at *1 (D. Utah Sept. 26, 2018).
[30] *Brock v. Herbert*, 435 F. App'x 759, 763 (10th Cir. 2011) ("It appears we have never
specifically held the continuing violation theory applies to claims brought under § 1983."); *see
Gosselin v. Kaufman*, 656 F. App'x 916, 919 (10th Cir. 2016).
[31] *Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018).

Regardless, just as in the *Herbert* and *Vasquez* cases, the continuing violation doctrine is inapplicable here because Baker is challenging discrete individual acts or decisions, not a pattern of wrongful conduct. Baker alleges that Tubbs wouldn't provide him "special shoes" in 2005; that PA Clark refused to provide him "medical sports shoes" in 2010; that Jeffries refused to provide authorization for well-fitted shoes in 2010; and that Sam Stone delivered the wrong shoes in 2010. While these claims are not true, even if assumed, they can and should have each been challenged individually as they are discrete acts or decisions.[32] "Said another way, the continuing violation doctrine, as we have defined it, would apply here only when a particular defendant allegedly committed wrongful acts within, as well as outside, the limitations period."[33]

Here, there is no allegation that Stone, Jeffries, Clark, or Tubbs committed wrongful acts within the limitations period. Thus, the statute of limitations bars these claims and they cannot be tolled. Regardless, each State Defendant is clearly entitled to qualified immunity.

## II.     The Extensive Course of Baker's Neuropathy Treatment Evidences That Each of The State Defendants Are Entitled to Qualified Immunity.

The undisputed facts evidence the State Defendants are entitled to qualified immunity. Here, despite attempts to characterize otherwise, Baker is claiming only a difference of opinion with the course of his foot care treatment undertaken by the USP and UMC medical staff. But disagreements with the treatment provided by prison medical staff do not rise to the level of deliberate indifference necessary to violate the Eighth Amendment.[34]

---

[32] *Vreeland v. Fisher*, 682 F. App'x 642, 646 (10th Cir. 2017) (quoting *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011)); *Hickox v. Cty. of Blair*, 591 F. App'x 107, 110 (3d Cir. 2014) (the "continuing violation" doctrine is not continual ill effects from an original violation).

[33] *Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018).

[34] *See Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir.1999).

Here the *Martinez* Report and exhibits thereto indicate that when anyone on the USP medical staff—or others consulted to assist in Baker's care—felt that Baker had a significant medical issue; they treated it properly. Every time Baker went to the infirmary or requested medical attention for his feet, his concerns were addressed in a timely, reasonable, and professional manner.

At most, Baker alleges the State Defendants acted negligently.[35]  But, "[a] prison doctor's 'negligent diagnosis or treatment of a medical condition do[es] not constitute a medical wrong under the Eighth Amendment,' [citation omitted], as '[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.'"[36] Furthermore, inadvertent or negligent failure to provide medical care, however serious the consequences, does not rise to "deliberate indifference to serious medical needs" and is not a constitutional violation.[37]

Baker claims USP delayed his care. "Delay in [providing] medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."[38] The Tenth Circuit has held the "substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."[39]  For medical delay to become deliberate indifference, it must have been an intentional delay.[40]  The record evidences no intentional delay.

---

[35] *Horton v. Ward*, 2005 WL 419814 at page 3 (10th Cir.); *see Billingsley v. Howard*, 196 F. App'x 258, 260 (5th Cir. 2006) (claim prison medical officials intentionally interfered with physician's shoe order was frivolous even where inmate had peripheral neuropathy).
[36] *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir.2008).
[37] *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980).
[38] *Sealock*, 218 F.3d at 1210.
[39] *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).
[40] *Abney v. McGinnis*, 2007 WL 844675, at *3 (S.D.N.Y. Mar. 16, 2007).

The fact that Baker eventually suffered amputation of five toes does not make his claims more plausible.  It is undisputed that Baker suffered from diabetic neuropathy in the "early nineties."  Neuropathy is a slow progressing disease.  The Eight Circuit has held that "peripheral diabetic neuropathy, [is] a disease which causes numbness in the feet and makes any injury to his feet a serious health risk[.]"[41]  Many "different factors [] could have resulted in [prisoners] amputations, including his own decision to decline medical treatment[.]"[42] The Tenth Circuit has never held that constant monitoring and medical care like Baker received, amounts to deliberate indifference to a neuropathy, simply because the condition results in amputation of toes.  In fact, the Tenth Circuit, and many other District Courts, have repeatedly held exactly the opposite.[43]

---

[41] *Gibson v. Weber*, 433 F.3d 642, 644 (8th Cir. 2006).

[42] *Id*.

[43] *See Holt v. McBride*, 539 F. App'x 863, 866 (10th Cir. 2013) (insufficient allegations prison medical failed to treat neuropathy); *Helms v. Sorenson*, 2015 WL 8519383, at *2 (W.D. Okla. Nov. 23, 2015), report and recommendation adopted, 2015 WL 8494006 (W.D. Okla. Dec. 10, 2015) (no deliberate indifference in treatment of peripheral neuropathy); *see also Black v. Goldberg*, 2017 WL 2455081, at *2 (E.D.N.Y. June 6, 2017) (no deliberate indifference in medical conclusion that inmate didn't need supportive footwear); *Carter v. Meisner*, 2014 WL 5580917, at *7 (W.D. Wis. Oct. 31, 2014), aff'd, 639 F. App'x 379 (7th Cir. 2016) (inmate who had peripheral neuropathy belief he was entitled to better footwear is not a basis for deliberate indifference); *Acrey v. Zestos*, 2014 WL 4410151, at *5 (E.D. Mich. Sept. 8, 2014) (no deliberate indifference where prisoner with neuropathy was given soft shoes that were taken away); *Gachett v. McCabe*, No. 1:13-CV-00172-MJS PC, 2013 WL 593713, at *3 (E.D. Cal. Feb. 14, 2013) (no deliberate indifference based on denial of orthotic boots); *Ganstine v. Buss*, 2011 WL 6780956, at *3 (N.D. Fla. Dec. 27, 2011), aff'd sub nom. *Ganstine v. Sec'y, Florida Dep't of Corr.*, 502 F. App'x 905 (11th Cir. 2012) (failure to prescribe soft diabetic shoes because Dr. did not believe inmate needed them was not deliberate indifference."); *Wagle v. Skutt*, 2011 WL 6004344, at *5 (E.D. Mich. Nov. 7, 2011) (inmates claim of having ill-fitting shoes failed to allege deliberate indifference); *Edwards v. Hernandez*, 2010 WL 3604399, at *8 (D. Colo. Aug. 11, 2010), report and recommendation adopted, 2010 WL 3604177 (D. Colo. Sept. 8, 2010) (not facilitating purchase of wider shoes is not deliberate indifference); *Threatt v. Olger*, 2010 WL 1848515, at *9 (W.D. Mich. May 7, 2010) (no deliberate indifference in denial of medical detail shoes); *Ludy v. Sherman*, 2007 WL 320831, at *8 (W.D. Pa. Jan. 30, 2007) (denial of a soft shoe pass and appropriate footwear for inmate with neuropathy is not deliberate indifference).

Baker was treated in a professional manner throughout his incarceration and nothing he was treated with, or treated for, amounts to deliberate indifference.

### A.   Sam Stone had no personal participation, or affirmative link, and was not deliberately indifferent to Baker's medical needs.

An individual can be found liable under § 1983 only "based on personal involvement in the constitutional violation."[44]  Section 1983 requires an "affirmative link" between a defendant's acts and the alleged constitutional violation.[45] In order for a prison official to be liable for "deliberate indifference" under § 1983, "the official must have been personally and ***directly responsible*** for the occurrence of the alleged Eighth Amendment violation."[46]

Here, the record evidence is clear that Sam Stone had no personal involvement in any claimed deliberate indifference.  Sam Stone is the Medical Supply Officer at the USP.  In April of 2009, Baker met with Stone, who measured his feet and procured and delivered a pair of size 12, 4E, New Balance shoes.[47]  Baker complains that these shoes were not "well-fitted" and at best were a "little better" than the standard prison issued shoes.[48]  On May 5, 2010, Baker again met with Stone, who delivered pair of Pedors specialty orthotic shoes cleared by the Clearance Committee.  Baker complains Pedors shoes were not what he wanted.

As a medical supply officer, Stone was not involved in Baker's medical diagnosis or care, or in the Clearance Committee's decisions. (Docket No. 50-13, at ¶ 22). Because Stone is not a

---

[44] *Foot v. Spiegal*, 118 F.3d 1416, 1423 (10th Cir. 1997).
[45] *Auvaa v. City of Taylorsville*, 506 F. Supp. 2d 903, 910 (D. Utah 2007) (*quoting Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1157 (10th Cir. 2001)).
[46] *Jenkins v. Denver County Jail*, 2000 WL 84893, at *2 (10th Cir.2000) (emphasis added).
[47] *Williams v. Keane*, 940 F. Supp. 566, 571 (S.D.N.Y. 1996) ("new balance" shoes are sufficient for purposes of prison foot treatment).
[48] *Abney v. McGinnis*, 2007 WL 844675, at *3 (S.D.N.Y. Mar. 16, 2007) (inmate's subjective opinion of fit and comfort of sneakers provided is not evidence of deliberate indifference).

member of the UDOC's medical staff or Clearance Committee, he was not personally involved in treatment or medical decision and "cannot be held liable for it."[49]

While it is true that in certain circumstances, the failure to provide basic corrective/medical devices may amount to deliberate indifference to a serious medical need, these claims should be brought against the medical personnel making these decisions. There is no caselaw that holds an inmate can hold the supply officer to a deliberate indifference standard when he procured the shoes (sneakers and orthotic Pedors) that the treating physician had ordered. Stone is not a physician and cannot provide treatment to Baker. There is no evidence that "demonstrate[s] any personal participation on the part of [Stone] or even any knowledge on [Stone's] part of plaintiff's medical needs."[50]

Stone follows the orders he is given with regard to procuring medical supplies. Under no scenario can these facts - of simply doing one's job as requested by a treating physician - evidence personal participation in any Eighth Amendment violation.[51] Sam Stone did not personally participate in any alleged constitutional violation.

> **B.    Dr. Tubbs was not deliberately indifferent when he told Plaintiff that he would have to buy shoes at the commissary.**

Given the early and undiagnosed nature of Baker's neuropathy and poor circulation in 2005, when he entered prison, Tubbs advice to purchase New Balance shoes at the commissary, based on the recommendation of the U of U, was well within the standard of care regarding shoes for a prisoner with this condition. (Tubbs Dec., Docket No. 50-10, at ¶ 9).  UMC wanted

---

[49] *Boles v. Dansdill*, 361 F. App'x 15, 18 (10th Cir. 2010) (citing *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir.1993)).

[50] *Tatum v. Simpson*, 202 F. App'x 301, 302 (10th Cir. 2006).

[51] There is also no evidence that Stone acted with a sufficiently culpable state of mind.

Baker to have better fitting athletic shoes.  If UMC had wanted Baker to have anything else, like for example Pedors or FitWell shoes, that is what they would have stated. Dr. Smith's note only says that Baker needs "better fitting" wider shoes.  This is what he purchased.

In *Bismark v. Fisher*, the Eleventh Circuit addressed a situation where a prisoner's "feet blistered, swelled and split open."[52]  "The prison sent Bismark to an outside podiatrist, who prescribed special orthopedic shoes and medically molded arch inserts, all at DOC expense."[53] Although *Bismark* received the inserts, the specialty shoes never arrived.  The inmate was then told by another physician to purchase sneakers, which were available in the prison canteen.[54] "Nothing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that "a simple difference in medical opinion" does not constitute deliberate indifference."[55]  Here, Tubbs didn't even disagree with Dr. Smith, in fact Tubbs told Baker to do just what Dr. Smith said to do, purchase "better fitting" wider shoes.  Requiring Baker to purchase his own "well fitted" shoes is not deliberate indifference.[56]  Prisoners suffering from peripheral neuropathy have often been required to purchase their shoes from the prison "canteen" as such shoes are an "alternative course of treatment."[57]  Prisons can even require prisoners to

---

[52] *Bismark v. Fisher*, 213 F. App'x 892, 894 (11th Cir. 2007).
[53] *Id*.
[54] *Id*.
[55] *Id*. (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir.1989)).
[56] *See Gachett v. McCabe*, 2013 WL 593713, at *3 (E.D. Cal. Feb. 14, 2013)
[57] *See Helms v. Sorenson*, 2016 WL 3017366, at *5 (W.D. Okla. Apr. 21, 2016), report and recommendation adopted, 2016 WL 3030269 (W.D. Okla. May 24, 2016) (shoe insoles presented an alternative course of treatment).

purchase their own orthotic or "well fitted" shoes "through an independent vendor[.]"[58]

The First Circuit has also held that "[e]ven if it could be said that failing to provide the orthotics earlier reflected poor judgment on the part of some defendants—a matter on which we take no view—this was not an omission that could be termed "deliberate indifference to serious medical needs[.]"[59] Again, here, Tubbs did just what Dr. Smith requested.  He told Baker how to purchase better fitting wider athletic shoes. The evidence is not in dispute that Baker did purchase his own New Balance shoes.  He also received medical clearances for insoles.  (Baker 1269).  And when Baker could no longer afford to purchase better fitting shoes at the commissary, he received them through a medical clearance that began on April 9, 2009. (Baker 1268).  There was no deliberate indifference by Dr. Tubbs.

> **C.    Dr. Roberts was not deliberately indifferent in February of 2013 when addressing Baker's medical clearance issues.**

There is no evidence that Baker was without any clearance needed for his peripheral neuropathy. Baker never had inappropriate shoes for his medical conditions. (Roberts Dec., Docket No. 49-14, at ¶ 11). On February 19, 2013, Baker's clearance requests for size 13 medical shoes, a bottom bunk clearance, a bottom tier, and a shower chair had been submitted. (Docket No. 49-14, at ¶ 22). These clearance requests were submitted to the clearance review committee. On February 20, 2013 Roberts noted in Baker's medical charts, among other things, that certain clearances should be revisited pending confirmation of MS diagnosis. (Docket No.

---

[58] *See Edwards v. Hernandez*, 2010 WL 3604399, at *7 (D. Colo. Aug. 11, 2010), report and recommendation adopted, 2010 WL 3604177 (D. Colo. Sept. 8, 2010) (these interactions do not demonstrate the requisite subjective state of deliberate indifference).
[59] *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 163 (1st Cir. 2006).

49-14, at ¶ 23). Baker had the medically cleared shoes as of January 8, 2013.  "Already got his

shoes for MS just needs clearance."  (Baker 1267).

After meeting with Baker in February 2013, Roberts resubmitted Baker's clearances for a

bottom bunk, a shower chair, and size 13 orthopedic shoes. The clearances were all denied by the

Clearance Committee. Roberts has "no authority to approve or deny the medical clearances that

the committee reviews." (Docket No. 49-14, at ¶ 26).  All clearances were eventually reinstated

by the Clearance Committee. (Docket No. 49-14, at ¶ 27); (Baker 1265-66). And, Baker was

never not in possession of his medically cleared shoes, which clearance was approved again by

the Clearance Committee on March 29, 2013.  Baker also would have had his laundry issue

shoes, and the ability to purchase shoes.  The cases cited herein evidence that the brief time that

Baker was without the clearance approval, again he never did not have the medical shoes, is not

deliberate indifference.[60]

### D.   PA Coombs was not deliberately indifferent when in Spring of 2013, Defendant Coombs debrided a pressure sore.

Baker alleges that in the Spring of 2013 Coombs cut open a pressure sore, causing

infection.  (Docket No. 45, at page 12 of 19).  This allegation is false. The medical records do not

indicate such a visit in the Spring of 2013. The medical records indicate that in November of

2013 Coombs pared down a blister for Baker so that it could heal quicker.  (Coombs Dec.,

---

[60] *See Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir.2007) (special shoes were not
necessary despite outside podiatrist's prescription for special shoes); *Turner v. Solorzano*, 228 F.
App'x 922, 923–24 (11th Cir.2007) (affirming summary judgment against a prisoner who had an
amputated toe but was not prescribed soft shoes); *Ganstine v. Buss*, 2011 WL 6780956, at *3
(N.D.Fla. Dec.27, 2011) (failure to prescribe soft diabetic shoes by doctor who examined the
plaintiff and found he did not need soft shoes was not deliberate indifference); *see also Askew v.
Davis*, 613 F. App'x 544, 547 (7th Cir. 2015) (medical staff exercised professional judgment
deciding that the shoes were not medically necessary).

Docket No. 50-15, at ¶ 5-7). Debridement of a wound involves removing or paring down of dead skin or excess tissue around a wound.  Coombs did these multiple times for Baker. (Docket No. 50-15, at ¶ 54).  UMC also treated Baker by debriding his wounds. (Baker 002).  This is proper treatment for wounds such as pressure ulcers.

Paring down, or debriding an ulcer wound, is the only way to treat it and remove any possibly necrotic tissue.  And case law has routinely held that debriding a wound is not deliberate indifference.[61]  Just last year a District Court held that when an inmate's wounds were debrided, and he was given a prescription for a topical anesthetic, "[t]he Court finds the undisputed medical records show Defendant Smith did not act with . . . deliberate indifference to Plaintiff's serious medical needs."[62]

Baker is incorrect that debriding his wound was what caused his infection. His infection was a result of the disease and his poor foot care. Bakers habits of walking and pacing, sometimes with no footwear, treating himself, and his problems with blood flow and circulation significantly exacerbated his condition and would inhibit our ability to treat his ulcers and prevent infections. (Docket No. 50-15, at ¶ 51). USP medical staff did all they could to assist Baker and keep his wounds clean and infection free.

For example, shortly after Baker began developing non-healing pressure ulcers on his feet, he was referred to UMC for consult with both their orthopedic doctors and their wound clinic. (Docket No. 50-15, at ¶ 49). Coombs was worried that when Baker had an infection in his

---

[61] *Tidwell v. Fortner*, 61 F. App'x 917 (5th Cir. 2003) (citing cases); *see Eller v. Stone*, 2018 WL 3385190, at *6–7 (S.D. Ala. June 6, 2018), report and recommendation adopted, 2018 WL 3384307 (S.D. Ala. July 11, 2018) (no deliberate indifference debriding infected wound).
[62] *Hayes v. Washington, Dep't of Corr.*, 2018 WL 1135422, at *13 (W.D. Wash. Jan. 19, 2018), report and recommendation adopted, 2018 WL 1083855 (W.D. Wash. Feb. 28, 2018).

wound that it could lead to an infection in his bones.  Thus, Baker was referred for multiple

MRIs, sent to the infectious disease (wound) clinic at UMC, and routinely transported back and

forth.  Anytime an infection gets into the bone, amputation is a possibility.  UMC would make

that decision. (Docket No. 50-15, at ¶ 50). Anytime an infection was suspected Baker was placed

on antibiotics and dressing changes were ordered. (Docket No. 50-15, at ¶ 56).

The State Defendants have produced a litany of medical records evidencing the

reasonable care Baker received.  The evidence shows that Baker's care was outstanding and

possibly better and more prompt than anyone outside of prison would have received.  Baker's

care, especially as received from Coombs, was not deliberate indifference.

      **E.**    **PA Jeffries was not deliberately indifferent and never refused to provide authorization for well-fitted shoes or withheld vital medications from Baker.**

Baker's allegation that Jeffries refused to provide authorization for "well-fitted" shoes is

incorrect. (Docket No. 13, at page 14 of 136).  Baker went to the infirmary in October of 2010

and tried to tell Jeffries that he needed new Pedors shoes because they had a hole in them.  But

Baker had just been issued the yearly Pedors shoes in May.  (Jeffries Dec., Docket No. 49-12, at

¶ 8).  "The hole in Baker's shoe looked to be about 1/16 inch of diameter by his big toe and not

by any way was it preventing him from walking comfortably. It was not affecting the

functionality of the Pedors shoe.  I considered it more of a cosmetic issue, and a tiny hole."

(Docket No. 49-12, at ¶ 9). Jeffries "explained to Baker that there was no guarantee he would get

a replacement pair of medical shoes as they had just been issued in May 2010, and it was now

only October 2010.  Also, the hole he was complaining of was tiny."  (Docket No. 49-12, at ¶

15).  Jeffries was not deliberately indifferent in not replacing the medical shoes.  Baker's

36

"medical shoes were in good condition and the hole was not preventing him from walking." (Docket No. 49-12, at ¶ 16).

Regardless, the Seventh Circuit has cautioned that Court's must "[r]emember, deliberate indifference indicates a culpable state of mind, something akin to criminal recklessness, which requires that the defendant be aware of and disregard an excessive risk of serious harm to the inmate."[63]  In *Norfleet*, the prisoner had been prescribed "soft-soled" shoes that were confiscated.[64]  Norfleet alleged the medical team was deliberately indifferent because he had a prescription for soft-soled shoes they would not allow him to wear.  The Seventh Circuit held there was no deliberate indifference.[65] Even if confiscating medically necessary shoes is negligent, "even admitted medical malpractice does not give rise to a constitutional violation."[66] Here, Jeffries did not <u>confiscate</u> medical shoes, rather he did not provide new ones because of a cosmetic tiny hole.  This is not deliberate indifference and no case holds otherwise.

Baker also incorrectly claims that on February 25, 2013 Jeffries "withheld vital medications." (Docket No. 45, at page 12 of 19).  There is no record of a February 25, 2013 medical visit.  (Baker 1160-1162).  This visit was actually on January 18, 2013.  (Baker 1172). The medications at issue on this visit were Sudafed and ibuprofen.  (Docket No. 49-12, at ¶ 22-24); (Baker 1301). It was too early to refill Baker's Sudafed prescription, as inmates are only allowed 30 tablets per month, and Motrin was refilled.  (Baker 1172).  There is no deliberate indifference associated with this routine medical visit, and no case says otherwise.

---

[63] *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006).
[64] *Id.*
[65] *Id.*
[66] *Id.*

### F.   PA Clark was not deliberately indifferent and at no time did Clark refused to provide medical sports shoes to Baker.

Baker claims that before October 28, 2010, Clark had refused to provide a medical sports shoe needed. The record evidence is that Baker purchased better fitting wide athletic shoes from 2005 to 2009, received New Balance shoes in 2009, and Pedors shoes in 2010.  Bakers complaint is that he received the Pedors shoe, instead of the New Balance shoes.  But, a prisoner's disagreement with particular medical decision denying shoe accommodations for "right foot neuropathy" is not evidence of deliberate indifference where defendants otherwise reasonably and diligently treated prisoner's medical needs over an extended period of time.[67]  Similarly, the Colorado District Court has held that where an inmate suffering from neuropathy there was no deliberate indifference where "defendants have examined plaintiff many times, have submitted him for various tests, and have prescribed various treatments for … his neuropathy."[68]

As to Clark specifically, in 2010, "On March 8, 2010 [Clark] saw Baker and he reported that he was getting pressure ulcers from shoes over a year ago.  He reported these ulcers had all resolved.  He did have a nodule on one toe, that he had tried, himself to file down and it started bleeding.  There were no signs of infections, and I did order an x-ray of the area." (Docket No. 49-11, at ¶ 17); (Baker 1323-24). "The medical records indicate that on April 20, 2010 [Clark]

---

[67] *See Dulak v. Corizon Inc.,* No. 14-10193, 2014 WL 4678085, at *5 (E.D. Mich. June 9, 2014), report and recommendation adopted, No. 14-10193, 2014 WL 4678086 (E.D. Mich. Sept. 18, 2014) ("plaintiff had the option of buying athletic shoes at his own expense.").
[68] *Atkinson v. Ortiz,* 2009 WL 3161960, at *8 (D. Colo. Sept. 29, 2009) (neuropathy can have a natural, inexorable progression and while defendants have not pursued all possible treatments the Eighth Amendment does not necessarily require them to do so): *See Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir.1992) (denial of treatment by a specialist is insufficient to establish a constitutional violation).

saw Baker again, reported that his feet were normal, and that the wound seen in March was resolving.  "It is healing and doing well."  I also did order inserts and arch supports for size 12-4E shoes for Baker." (Docket No. 49-11, at ¶ 18); (Baker 1320).  These clearances were granted, as well as the clearance for the shoes. (Baker 1268). Although, clearance requests are out of Clark's hands once he submits them. (Docket No. 49-11, at ¶ 19).  Nothing in these medical exams amounts to even a scintilla of deliberate indifference.

> **G.    PA Merrill was not deliberately indifferent when on July 22, 2013 he examined Baker's pressure ulcers and Merrill did not deny Baker the use of shower shoe for his ulcerated foot.**

During a medical examination on July 22, 2013, Baker "requested medical clearance for crutches and a shower shoe to wear to 'air his foot out.'" (Docket No. 49-16, at ¶ 7). Baker did not want this shoe for use in the shower, only because he wanted another form of footwear. (Baker 1118).  "After the visit on July 22, 2013, that same day, [Merrill] submitted a clearance request for Baker for crutches and a pair of shower shoes. This request then moved to the medical clearance committee."  (Docket No. 49-16, at ¶ 8).  Merrill is not on the Clearance Committee. The requested clearance for the shower shoe was denied by the Clearance Committee because Baker already had a clearance for a shower chair.

Regardless, as Judge Benson has held, the Utah State Prison is not deliberately indifferent when it accommodates an inmate with footwear "to the extent possible given their valid safety concerns."[69] Merrill's professional treatment was not deliberate indifference.

---

[69] *Gallegos v. Whitney*, 2010 WL 3362490, at *4 (D. Utah Aug. 23, 2010) ("Defendants were not deliberately indifferent to Plaintiff's medical need for special footwear.").

### III.    No Clearly Established Constitutional Violation.

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority[.]"[70] "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."[71]  The Supreme Court has repeatedly "stressed that courts must not define clearly established law at a high level of generality[.]"[72] For the Plaintiff to defeat a claim of qualified immunity, and clearly establish the law, the case presented must "squarely govern" . . . "in light of the specific context of the case, not as a broad general proposition."[73]  And "an unpublished opinion can be quite relevant in showing that the law was not clearly established."[74]

As discussed herein, the State Defendants provided reasonable treatment.  There is no case law that would have put the State Defendants on notice that their treatment of Baker, in conjunction with UMC, was deliberate indifference, even if Baker ultimately lost toes. Accordingly, there was no clearly established constitutional violation and each of the State Defendants are entitled to qualified immunity.[75]

---

[70] *D.C. v. Wesby*, No. 15-1485, 2018 WL 491521, at *11 (U.S. Jan. 22, 2018) (marks and citations omitted).
[71] *Wesby*, 2018 WL 491521, at *11.
[72] *Id*.
[73] *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).
[74] *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018).
[75] Because a *Martinez* Report is on file, (Docket No. 49), no Appendix of Exhibits is included.

DATED:  January 25, 2019.

SEAN D. REYES
Utah Attorney General

/s MEB W. ANDERSON
MEB W. ANDERSON
Assistant Utah Attorney General
Attorney for State Defendants

## CERTIFICATE OF MAILING

I certify that on January 25, 2019 I electronically filed the foregoing, **STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, using the Court's CM/ECF system, and I also certify that a true and correct copy of the foregoing was placed in the United States mail, postage prepaid, to the following:

Robert R. Baker, #166051
Utah State Prison
PO Box 250
Draper, UT 84020
*Pro se Inmate*

/s/ Meb W. Anderson